**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| PRESBYTERIAN HEALTHCARE SERVICES, The Cooper Center 9521 San Mateo Blvd. NE Albuquerque, NM 87113, | |

*Plaintiff,*

v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
200 Independence Avenue SW
Washington, DC 20201,

XAVIER BECERRA, in his official capacity as
Secretary of Health and Human Services,
200 Independence Avenue SW
Washington, DC 20201,

HEALTH RESOURCES & SERVICES
ADMINISTRATION,
5600 Fishers Lane
Rockville, MD 20857,

*and*

CAROLE JOHNSON, in her official capacity
as Administrator of the Health Resources &
Services Administration,
5600 Fishers Lane
Rockville, MD 20857,

*Defendants.*

1

## **COMPLAINT**

Plaintiff Presbyterian Healthcare Services (Presbyterian) alleges the following in support of its complaint:

## **INTRODUCTION**

1.      Presbyterian is a locally owned and operated not-for-profit healthcare system that serves one in three New Mexicans with healthcare or coverage.  It seeks emergency relief from arbitrary and capricious final agency action under the Administrative Procedure Act (APA) so that it may obtain long-sought pandemic relief dollars to offset medically necessary expenses incurred and revenues lost due to the COVID-19 pandemic.

2.      Presbyterian worked tirelessly to care for New Mexico residents during the COVID-19 pandemic.  It went to similar lengths to try to reach a rational resolution of this matter with the Health Resources Services Administration (HRSA) of the U.S. Department of Health and Human Services (HHS), without success.

3.      HRSA distributed pandemic relief dollars from the Provider Relief Fund (PRF) to eligible hospitals on behalf of HHS.  There was no regulatory regime governing the PRF.  Rather, HRSA administered the PRF through a vast array of sub-regulatory guidance that divided the distribution of PRF dollars into four phases of general distributions and other targeted distributions.  This guidance changed many times over the distribution periods, often with no notice to providers.

4.      This case is straightforward.  Presbyterian submitted a Phase 4 application for PRF dollars to HRSA through the HRSA online portal.  HRSA processed the application and paid Presbyterian $10,562,495.52 less than it should have in PRF dollars because HRSA calculated Presbyterian's Phase 4 payment using an imputed loss ratio, rather than on the basis of the actual

quarterly losses reflected in Presbyterian's Phase 4 application. HRSA used imputed losses because HRSA determined that the application's supporting files lacked documentation substantiating Presbyterian's actual losses in one of the six quarters reviewed.

5.      In November 2022, Presbyterian provided HRSA with an Excel file further substantiating all figures for actual quarterly losses from the Phase 4 application. HRSA encouraged Presbyterian to pursue full payment through HRSA's voluntary reconsideration process; HRSA told Presbyterian that a similarly situated provider had obtained relief through the reconsideration process, and that Presbyterian had a good case for reconsideration. HRSA uploaded the Excel file to Presbyterian's case record with the Phase 4 application the same day.

6.      Presbyterian relied on HRSA's conduct and representations and proceeded in good faith. It filed its Phase 4 reconsideration request on November 9, 2022, and repeatedly followed up with HRSA on the request for approximately 8 months.

7.      HRSA then summarily denied Presbyterian's Phase 4 reconsideration request and ended all reconsideration payments.

8.      It was arbitrary and capricious for HRSA to summarily deny Presbyterian's Phase 4 reconsideration request. HRSA summarily denied the request without first considering whether it was reasonable to do so under the circumstances. The summary denial was unreasonable because Presbyterian met the statutory criteria for payment; HRSA had granted reconsideration relief to a similarly situated provider; HRSA encouraged Presbyterian to invoke the reconsideration process based on HRSA's stated reasons for the lower payment on the Phase 4 application; HRSA uploaded substantiating documentation to the case record with the Phase 4 application before Presbyterian filed a reconsideration request; and Presbyterian relied on HRSA's conduct and representations in preparing and pursuing a reconsideration request. HRSA did not provide

Presbyterian with reasonable notice of the summary denial, much less reasonably explain the rationale (if any) for the summary denial to Presbyterian.

9.      The ending of all reconsideration payments was equally arbitrary and capricious. HRSA announced that no further reconsideration payments will be made because the Fiscal Responsibility Act of 2023 (FRA), Pub. L. No. 118-5, 137 Stat. 10 (2023), rescinded appropriations of unobligated PRF dollars.  HRSA made the announcement in a three-sentence Program Update that HRSA posted on its website on June 5, 2023.

10.     The Program Update left out the most important parts of the story.  For starters, it left out that HRSA established the reconsideration process through informal guidance. Reconsideration was a HRSA policy, not a statutory or regulatory process.  The decision to end all reconsideration payments was thus a HRSA policy change.

11.     Plus, Congress did not mandate the end of reconsideration payments in the FRA. To the contrary, Congress reserved hundreds of millions of unobligated PRF dollars for HRSA in the FRA.  HRSA had also recouped millions in improperly paid and unused PRF dollars from providers.  So, PRF dollars remained available to make reconsideration payments.

12.     HRSA also failed to acknowledge and supply good grounds for its policy change in the Program Update.  HRSA did not make clear that it chose to end reconsideration payments when PRF dollars remained available.  And HRSA offered no rationale for its choice.

13.     HRSA also changed its policy without considering the reliance interests of Presbyterian and other providers in the reconsideration process, determining whether those interests were significant, and weighing them against competing policy concerns.

14.     For its part, Presbyterian had serious reliance interests.  Presbyterian relied on HRSA to adjudicate the Phase 4 reconsideration request on its merits, consistent with the process that HRSA set out in guidance and encouraged Presbyterian to use.

15.     HRSA could have accounted for serious reliance interests.  For example, HRSA could have prioritized the adjudication of reconsideration requests that were based on HRSA's acceptance and uploading of documents that substantiated the figures in the underlying application. Alternatively, after the FRA became law, HRSA could have used available PRF dollars to make reconsideration payments as part of a phased, orderly, and transparent termination of the reconsideration process.  HRSA failed to weigh such policy options.

16.     Instead, HRSA encouraged Presbyterian to pursue its Phase 4 reconsideration request for approximately 8 months based on HRSA's stated reasons for the lower payment on the Phase 4 application, summarily denied $10,562,495.52 in PRF dollars to Presbyterian, failed to reasonably explain the denial to Presbyterian, and announced the sudden end of a multi-billion-dollar pandemic relief program affecting thousands of providers by posting a conclusory, one-paragraph Program Update on its website.

17.     The denial of PRF dollars has diminished Presbyterian's ability to fulfill its mission to ensure all the patients, members, and communities it serves can achieve their best health.  This irreparable harm continues with every passing day.

18.     Presbyterian faces the threat of losing access to PRF dollars as they are obligated or redistributed by HHS and HRSA.  The loss of access to PRF dollars would irreparably harm Presbyterian.  The threat of that loss is imminent.

19.     This Court should stop the irreparable harm to Presbyterian by restraining the Defendants from enforcing its Phase 4 payment determination against Presbyterian.  This Court should order the Defendants to immediately obligate presently unobligated PRF dollars[1] or set

---

[1] Unobligated PRF dollars include all appropriations to the Public Health and Social Services Emergency Fund that Congress authorized any Defendant to use to prevent, prepare for, and respond to coronavirus, and that remain unobligated.

aside recouped PRF dollars in the total amount of $10,562,495.52, subject to the Defendants determining the final PRF dollars payable to Presbyterian through the adjudication of the Phase 4 reconsideration request.  It should order the Defendants on remand to adjudicate the Phase 4 reconsideration request, determine the final PRF dollars payable to Presbyterian, and disburse those PRF dollars within a reasonable time.

## PARTIES

20.     Presbyterian is a New Mexico nonprofit corporation and not-for-profit organization under § 501c(3) of the Internal Revenue Code.  Its principal place of business is at 9521 San Mateo Blvd. NE, Albuquerque, NM 87113.

21.     Defendant Xavier Becerra is the Secretary of Health and Human Services. The Secretary is the principal officer who heads the U.S. Department of Health and Human Services (HHS) and administers the statutes that created and funded the Public Health and Social Services Emergency Fund (PHSSEF).  Secretary Becerra is sued in his official capacity only.

22.     Defendant HHS is the federal department headed by the Secretary.  It created the Provider Relief Fund (PRF) with funds from the PHSSEF.

23.     Defendant Carole Johnson is the Administrator of the Health Resources & Services Administration (HRSA).   The Administrator is the principal officer who runs HRSA. Administrator Johnson is sued in her official capacity only.

24.     HRSA is an operating division of HHS.  It administers the PRF for HHS.

## JURISDICTION AND VENUE

25.     Plaintiffs bring this suit under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

26.     The court's jurisdiction is invoked under 28 U.S.C. § 1331.

27.     Venue is proper in this district under 28 U.S.C. § 1391(e) because the plaintiff resides in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL BACKGROUND

### A.     Presbyterian was a leader in the pandemic response in New Mexico

28.     Presbyterian was founded in Albuquerque, New Mexico, in 1908 as a haven for tuberculosis patients.  Declaration of Heather Zundel, ¶ 13, Tab 1 at pp. 126-27 (attached as Exhibit 1).  Its sole purpose is to improve the health of the patients, members, and communities that it serves.  *Id*., p. 145.

29.     Presbyterian has grown to include nine hospitals, a health plan, and a physicians' group, and now helps more than one in three New Mexicans with their healthcare needs.  *Id*., p. 127.  In 2020 alone, more than 950,400 New Mexicans visited its hospitals and clinics or were members of its health plan.  *Id*.  In a state where more than 50 percent of the population is either uninsured or covered through the Medicaid program, Presbyterian and its affiliates provided over $380,978,000 in uncompensated healthcare services.  *Id*., pp. 126, 146.

30.     In 2020, Presbyterian was at the forefront of New Mexico's efforts to care for patients while preventing the spread of COVID-19.  *Id*., p. 127.  In addition to direct care of patients and members, surge planning, ensuring adequate personal protective gear, and providing free COVID-19 testing, Presbyterian was instrumental in creating and leading statewide collaborative efforts.  *Id*.  It served on New Mexico's medical advisory team, providing predictive analytics to understand the impact of COVID-19 on New Mexicans.  *Id*.  It also maintained a coronavirus hotline and a central command center to manage statewide hospital capacity while ensuring that all patients received safe, timely care and that no one hospital became overwhelmed by COVID-19 patients.  *Id*.  The other emergency measures undertaken by Presbyterian included

the creation of a COVID-19 drive through testing site, an outpatient infusion clinic to administer intravenous COVID-19 treatments, expansion of telehealth and phone appointments, execution of COVID-19 vaccination and public education campaigns and provided mobile on site testing services for vulnerable populations in nursing homes and on tribal lands. *Id.*, p. 128.

31.     Presbyterian has earned numerous recognitions for its work on behalf of New Mexicans. For example, the Lown Institute Hospitals Index rated Presbyterian an A+ overall and second in the nation among health care systems. *Id.*, pp. 134-35. U.S. News & World Report named Presbyterian Hospital a Best Regional Hospital. *Id.*, p. 135. And the New Mexico Hospital Association awarded Presbyterian Rust Medical Center and Lincoln County Medical Center the Quest for Excellence Award. *Id.*, p. 136   Lincoln County Medical Center, which is a critical access hospital, also received a five-star overall hospital quality rating from the Centers for Medicare & Medicaid Services (CMS). *Id.*, p. 136.

**32.**     When COVID-19 threatened New Mexicans, Presbyterian answered the call. It partnered with the federal and state governments, helped lead the statewide response, and delivered lifesaving care to New Mexicans regardless of their means.

**B.     Congress appropriated funds to help providers such as Presbyterian offset health care related expenses or lost revenue attributable to COVID-19**

33.     On March 27, 2020, Congress passed the Coronavirus, Aid, Relief and Economic Security Act (CARES Act) and appropriated $100 billion to the PHSSEF for health care providers "for health care related expenses or lost revenues that are attributable to coronavirus." Pub. L. No. 116-136, 134 Stat. 281 (2020). HHS created the PRF with these funds. Congress increased the appropriations to the PHSSEF through the Paycheck Protection Program and Health Care Enhancement Act (PPPHCEA), Pub. L. No. 116-139, 134 Stat. 620 (2020) and the Consolidated Appropriations Act, 2021 (CAA), Pub. L. No. 116-260, 134 Stat. 1182 (2020).

34. Congress tasked the Secretary with "reimburs[ing] through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." CARES Act 134 Stat. at 563, PPPHCEA, 134 Stat. at 622, CAA, 134 Stat. at 1920. Congress directed the Secretary to review applications on a rolling basis and make payments "in consideration of the most efficient payment systems practicable to provide emergency payment." CARES Act 134 Stat. at 563; PPPHCEA, 134 Stat. at 623; CAA, 134 Stat. at 1920. "[E]ligible health care providers" are "public entities, Medicare or Medicaid enrolled suppliers and providers, and such for-profit entities and not-for-profit entities . . . that provide diagnoses, testing, or care for individuals with possible or actual cases of COVID-19." CARES Act 134 Stat. at 563; PPPHCEA, 134 Stat. at 623; CAA, 134 Stat. at 1920.

35. HRSA administered the PRF for HHS. HRSA distributed the PRF through four phases of general distributions and various other targeted distributions. HRSA did not implement the PRF through notice and comment rulemaking. Rather, it developed distribution and payment calculation methodologies internally for each general and targeted distribution and issued corresponding guidance on the HRSA website. HRSA frequently modified these methodologies. Changes were made without formal notice to providers.

36. On April 10, 2020, HRSA began distributing PRF dollars by making General Distribution Phase 1 payments to Medicare providers. HRSA distributed the Phase 1 General Distribution to Medicare-enrolled providers under two payment methodologies with the ultimate goal of paying providers the lesser of the sum of COVID-19 related losses from March and April 2020, or two percent of their gross receipts or sales or program service revenue. HRSA, Provider Relief Fund Past General Distributions (Phase 1 Payments), HRSA Provider Relief https://www.hrsa.gov/provider-relief/payments-and-data/past-payments/general-distribution (last updated Nov. 2022). HRSA distributed initial Phase 1 payments automatically based on eligible

providers' 2019 Medicare Fee-For-Service payments.  *Id.*  HRSA based the second round of Phase

1 payments on providers' most recent tax year annual gross receipts.  HRSA distributed the second

round of Phase 1 payments either automatically to certain Medicare providers based on revenue

data from the providers' Medicare cost reports on file with CMS or for providers that do not submit

cost reports, based on submitted provider applications.  *Id.*

      37.    HRSA expanded PRF eligibility in Phase 2 to include participants in state Medicaid

programs, assisted living facilities, and dentists.  HRSA, <u>Provider Relief Fund  Past General</u>

<u>Distributions (Phase 2 Payments)</u>, HRSA  Provider  Relief,  <u>https://www.hrsa.gov/provider-</u>

<u>relief/payments-and-data/past-payments/general-distribution</u> (last updated Nov. 2022).  HRSA

paid eligible providers up to 2% of their total patient care revenue based on provider submitted

applications, which required reported revenue data and a copy of the provider's most recent federal

income tax return.  *Id.*

      38.    HRSA allocated $24.5 billion in additional funding to the Phase 3 General

Distribution.  HRSA, <u>Provider Relief Fund Past General Distributions (Phase 3 Payments)</u>, HRSA

Provider Relief, <u>https://www.hrsa.gov/provider-relief/payments-and-data/past-payments/general-</u>

<u>distribution</u> (last updated Nov. 2022).  Providers previously eligible to apply in earlier phases or

who had received other PRF payments were eligible to apply for additional Phase 3 payments

based on total patient revenue and financial losses and increased expenses.  *Id.*

      39.    The Phase 3 application form directed applicants to state their revenues.  Phase 3

application instructions (attached as Exhibit 2); s*ee also* HRSA, <u>Frequently Asked Questions:</u>

<u>Phase      3      Application      Process</u>,      HRSA      Provider      Relief,      68,

<u>https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/provider-relief-fund-faq-</u>

<u>complete.pdf</u> (last updated May 5, 2023).  The Phase 3 application form also directed applicants

to provide quarterly operating revenue and expenses from patient care.  Ex. 2.  Ultimately,

"[p]rocessing Phase 3 applications involved determining the greater of 88 percent of losses … for the first and second quarters of 2020 or 2 percent of net patient revenue from a provider's application submission, minus prior Provider Relief Fund (PRF) payments [made to that provider and its listed subsidiaries [in Phase 1 and 2 General Distributions]… ."  HRSA, Provider Relief Fund Phase 3: Payment Calculation Methodology, HRSA Provider Relief, 1, https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/phase-3-methodology-overview.pdf (last accessed Dec. 26, 2023).

40.     In September 2021, HRSA opened applications for Phase 4 General Distribution funding.  HRSA, Current and Future Payments: Phase 4 and ARP Rural Distributions, HRSA Provider Relief, https://www.hrsa.gov/provider-relief/payments-and-data/future-payments  (last updated Oct. 2023).  The Phase 4 application form directed applicants to upload a copy of their most recent federal income tax return and supporting documentation.  Ex. 1, ¶ 13, Tab 1, p. 2 (Presbyterian Phase 4 application); Phase 4 application instructions (attached as Ex. 3). Specifically, it directed them to "(19) Upload 2020 Q3 and Q4 and 2021 Q1 operating revenues and expenses form patient care documentation," and "(20) Upload 2019 Q1, Q3, Q4 operating revenues and expenses from patient care documentation."  Ex. 1, ¶ 13, Tab 1, p. 2; Ex. 3.  After submission of the Phase 4 application, the HRSA portal did not allow the provider to access the supporting documentation uploaded for Fields 19 and 20.

41.     The Phase 4 payment methodology had two components: a base payment and a bonus payment.  Relevant here, the base payment was allocated to providers based on their change in revenue and expenses from July 1, 2020 to March 31, 2021.  HRSA, Phase 4 General Distribution and ARP Rural Payments: Payment Methodology, HRSA Provider Relief, https://www.hrsa.gov/provider-relief/future-payments/phase-4-arp-rural/payment-methodology (last updated June 2022).  Large providers (with annual net patient care revenues greater than or

equal to $100 million) were eligible to receive 20% of their changes in revenues and expenses from the measurement period.  *Id*.  "HRSA then deducted from the Phase 4 Base Payment any prior Provider Relief Fund payments, which were not previously deducted from the Phase 3 General Distribution payment.  The Phase 4 deductions included any prior Provider Relief Fund payments that exceeded 2% of annual patient care revenue or 88% of changes in operating revenues and expenses for the first half of the calendar year."  *Id*.

42.     HRSA created a voluntary process through which a provider that believed its Phase 4 determination was calculated incorrectly could request reconsideration.  There were no statutory or regulatory standards or procedures for the reconsideration process.  HRSA created, structured, and conducted the process through sub-regulatory guidance documents on its website.

43.     HRSA limited the scope of its reconsideration to the review of its calculations based on the provider's Phase 4 application and reconsideration request.  The deadline for requesting Phase 4 reconsideration was February 21, 2023.  HRSA, Payment Reconsideration, HRSA Provider      Relief,      https://www.hrsa.gov/provider-relief/payments-and-data/payment-reconsideration  (last visited Dec. 26, 2023).

44.     The Phase 4 application instructions informed applicants that HRSA would exercise discretion in accepting or rejecting a Phase 4 application where the applicant failed to upload documentation substantiating the figures for Field 19.  Ex. 3 ("Failure to adhere to these requirements and the following instructions ***may*** result in HRSA deeming your application ineligible for payment." (emphasis added)).  Importantly, the instructions ***did not*** state that HRSA would deny all applications that failed to strictly adhere to the requirements, or that applicants were strictly prohibited from providing substantiating documents after filing, or that the HRSA staff lacked the authority to accept substantiating documents during the period between the denial of an application and the filing of a reconsideration request.  *See id*.  Nor did the instructions state

that substantiating documents accepted by the HRSA staff during the same period would be disregarded by HRSA when adjudicating the reconsideration request.  *See id.*

45.      After  the Phase 4 application deadlines ran, HRSA posted guidance on its website addressing Phase 4 reconsideration requests that sought edits, revisions, or corrections to Phase 4 applications.   HRSA did not notify providers of its posting of the guidance.   In any event, the guidance explained that a provider could not use a Phase 4 reconsideration request to edit, revise or correct its Phase 4 application, but HRSA had the discretion during the reconsideration process to ask for new, substantiating documentation as needed to adjudicate the request:

> **I attached the wrong documentation to my ARP Rural and Phase 4 application. Can I submit the correct information through the reconsiderations process?**
>
> No. The PRF reconsiderations process is intended for providers who believe their payment was not calculated correctly. Providers were able to initiate a single application for both programs through October 26, 2021, with a deadline to submit the application of November 3, 2021 at 11:59:59 PM ET. To ensure program integrity and the equitable treatment of all applicants, HRSA is unable to edit a provider's Phase 4/ARP Rural application. Providers will not be able to revise or correct their original application. *In some cases, the PRF Reconsiderations Team will request additional or clarifying documentation from an applicant directly, as needed.*

*See* HRSA, PRF Reconsiderations Request Frequently Asked Questions: Phase 4 and ARP Rural, HRSA  Provider  Relief,  https://www.hrsa.gov/provider-relief/payments-and-data/payment-reconsideration  (last visited Dec. 7, 2023) (italics added).

46.      HRSA required providers that submitted Phase 4 reconsideration requests to attest that "I understand that HRSA will not consider reconsideration requests that require revisions or corrections to the original Phase 4/ARP Rural application submission, including supplemental materials." Ex. 1, ¶ 23, Tab 11.  The attestation, however, applied only to *revisions or corrections* sought *in the reconsideration request*.   The attestation did not address HRSA uploads of

substantiating documents to the case records for Phase 4 applications before the filing of a reconsideration request.   Nor did the attestation address any "additional or clarifying" document that was requested by the PRF Reconsideration Team during the reconsideration process, and that neither revised nor corrected the figures in the Phase 4 application.

       **C.**      **HRSA paid $10,562,495.52 less than what Presbyterian expected based on a finding that documentation of actual quarterly losses was not provided**

      47.      Presbyterian satisfied all statutory and sub-regulatory eligibility criteria for a Phase 4 payment.  It was enrolled in Medicare and Medicaid and served CHIP beneficiaries.  It also provided diagnoses, testing and care for patients with possible and actual cases of COVID-19.  *Id*., ¶ 12.

      48.      Presbyterian entered Phase 4 with $5,201,162 in prior PRF payments that were not deducted from its Phase 3 General Distribution amount.  *Id*.  The prior PRF payments remained available to deduct from the Phase 4 Base Payment amount for Presbyterian.  *Id*.

      49.      Heather Zundel, Vice President for Internal Audit at Presbyterian, typically sent PRF submissions from Presbyterian to HRSA through the HRSA portal.  *Id*. Her customary practice was to double-check all file uploads for accuracy before submission.  *Id*.  She followed her customary practice when she timely sent Presbyterian's Phase 4 application to HRSA through the portal.  *Id*.  Her intent was for the file uploads for the Phase 4 application to include an Excel file that substantiated Presbyterian's actual quarterly losses.  *Id*., ¶ 12;  *see also id.*, ¶ 19, Tab 7, ¶ 20, Tab 8.

      50.      The portal accepted the Phase 4 application from Presbyterian.  *Id*., ¶ 14, Tab 2. HRSA processed the Phase 4 application and made a total Phase 4 payment of $15,539,766.42 to Presbyterian, which consisted of a Phase 4 Base Payment of $8,505,382.68, and Phase 4 Bonus Payment of $7,034,393.84.  Specifically:

(a.)    HRSA found that Presbyterian's "quarterly values were not fully supported as the quarterly support was not provided, which resulted in HRSA calculating the Base payment using imputed losses" instead of actual losses. *Id*., ¶ 23, Tab 11, p. 9.

(b.)    HRSA took "the annual patient care revenue of $1,703,693,492.00 times the mean ratio of adjusted losses to adjusted patient care revenue for [Presbyterian's] applicant type (Facilities – Acute Care Hospital) of 0.0402259679, resulting in imputed losses of $68,532,719.72." *Id*.

(c.)    HRSA found that "[a]s a 'large' organization … [Presbyterian] [was] eligible for 20% of losses, which is $13,706,543.94." *Id*.

(d.)    HRSA reduced that amount by the remaining $5,201,162 in prior PRF payments from earlier distributions, "resulting in a base payment of $8,505,382.68." *Id*.

(e.)    HRSA calculated a Phase 4 Bonus payment of $7,034,393.84 "based on Medicare, Medicaid, and CHIP administrative claims data from 01/01/2019 through 09/30/2020 for the one TIN on the application." *Id*., p. 10.

(f.)    The total Phase 4 payment was "the sum of [Presbyterian's] Base Payment ($8,505,382.68) and Bonus Payment ($7,034,393.84) … ." *Id*.

51.    As noted above, HRSA used imputed losses to determine the Phase 4 Base Payment instead of actual quarterly losses because it found that "quarterly values were not fully supported as the quarterly support was not provided."

52.    HRSA guidance stated that HRSA would determine actual quarterly losses using the following methodology:

1. Quarterly Losses (QL) = Change in Operating Revenues from Patient Care between Pre-Pandemic (2019) to COVID (2020 and 2021) (see Applicant Instructions Fields 13.1 – 13.6) MINUS Change in Operating Expenses from Patient Care between Pre-Pandemic (2019) and COVID (2020 and 2021) (see Applicant Instructions Fields 14.1 – 14.6)

HRSA, Payment Methodology: Provider Relief Fund Phase 4 Payment Overview, Step 2: Calculation of Initial Loss Ratio, Provider-Type Loss Ratios, and Provider Size, available at https://www.hrsa.gov/provider-relief/future-payments/phase-4-arp-rural/payment-methodology (last visited Dec. 26, 2023).

53.   The use of actual quarterly losses instead of imputed losses would have yielded a Phase 4 Base Payment of $19,067,878. Ex. 1, ¶ 12.  Specifically:

(a.)   Presbyterian's change in operating revenues from patient care between pre-pandemic (2019) to COVID (2020 and 2021) was $30,036,017.  *Id.*

(b.)   Presbyterian's change in operating expenses from patient care between pre-pandemic (2019) to COVID (2020 and 2021) was  $151,381,216.  *Id.*

(c.)   Presbyterian's actual quarterly losses were $121,345,199 ($151,381,216 - $30,036,017 = $121,345,199).  *Id.*

(d.)   Presbyterian's Phase 4 Base Payment was 20% of its actual quarterly losses, minus prior PRF payments (($121,345,199 x 20% = $24,269,040) - $5,201,162 = $19,067,878.20).  *Id.*

54.   Using actual quarterly losses, Presbyterian would have received a total Phase 4 Payment of $26,102,272.84 ($19,067,878.20 + $7,034,393.84 = $26,102,272.04).  *Id.*

55.   The actual total Phase 4 Payment to Presbyterian of $15,539,776.52 was $10,562,495.52 less than it would have been using actual quarterly losses.  *Id.*

**D.      Defendants encouraged Presbyterian to submit the Phase 4 reconsideration request and then summarily denied it after approximately 8 months**

56.     On August 5, 2022, HRSA informed Presbyterian by email that it would receive a Phase 4 payment.  Ex. 1, ¶ 15, Tab 3, pp. 2-5.  The total Phase 4 payment Presbyterian received was $15,539,776.52.  *Id*., ¶ 12.

57.     On August 9, 2022, Presbyterian emailed HRSA and asked how HRSA calculated the Phase 4 payment.  *Id*., ¶ 15, Tab 3, pp. 2-5.   Presbyterian did not receive a response.  *See id*., pp. 1-2.

58.     On August 23, 2022, Presbyterian emailed HRSA to follow up.  *Id*.  HRSA responded that it would contact Presbyterian when information was available.  *Id*., p.1.

59.     On September 12, 2022, Presbyterian emailed HRSA to follow up.  *Id*., ¶ 16, Tab 4, p. 3.  Presbyterian did not receive a response.  *See Id*.

60.     On October 28, 2022, Presbyterian emailed HRSA to follow up.  *Id*.  In response, HRSA explained that the Phase 4 payment was lower than Presbyterian expected because HRSA concluded that Presbyterian had failed to submit documentation in support of its actual quarterly losses.  *See Id.*, pp. 1-2.

61.     On November 2, 2022, Presbyterian met with HRSA through Microsoft Teams to discuss the Phase 4 payment.  *Id*., ¶ 12, ¶ 17, Tab 5, ¶ 18, Tab 6, ¶ 23, Tab 11, p. 4.  Presbyterian showed HRSA an Excel file that fully substantiated actual quarterly losses for the Phase 4 application.  *Id*., ¶ 12, ¶ 17, Tab 5, ¶ 18, Tab 6, ¶ 23, Tab 11, p. 4.

62.     In response, HRSA informed Presbyterian that the HRSA online portal lost Excel worksheets during the PDF conversion process and that the problem had affected other applicants.  *Id*., ¶ 12, ¶ 17, Tab 5, ¶ 18, Tab 6, ¶ 23, Tab 11, p. 4.

63.     At that time, HRSA and Presbyterian shared the belief that Presbyterian uploaded and the HRSA portal lost part of the substantiating Excel file for the Phase 4 application, which resulted in HRSA using imputed losses instead of actual quarterly losses to calculate the Phase 4 payment.  HRSA told Presbyterian that a similarly situated provider had obtained relief through HRSA's voluntary reconsideration process.  *Id*., ¶ 12, ¶ 17, Tab 5, ¶ 18, Tab 6, ¶ 23, Tab 11, p. 4. HRSA also told Presbyterian that HRSA believed that Presbyterian had a good case for reconsideration, and even offered to review Presbyterian's draft reconsideration request prior to submission to ensure that it had all the information that HRSA would need to grant the request. *Id*., ¶ 12, ¶ 17, Tab 5, ¶ 18, Tab 6, ¶ 23, Tab 11, p. 4.

64.     Presbyterian sent a substantiating Excel file to HRSA by email on November 2, 2022. *Id*., ¶ 12, ¶ 19, Tab 7, ¶ 20, Tab 8.  HRSA responded that day that it "uploaded the worksheet to the case record [for the Phase 4 application] in the Case Management System (SIMS Case 51964)." *Id*., ¶ 19, Tab 7.  By uploading the substantiating Excel file, HRSA allowed Presbyterian to supplement the supporting documentation for its Phase 4 application before Presbyterian submitted its Phase 4 reconsideration request.

65.     Presbyterian emailed its draft Phase 4 reconsideration request to HRSA on November 3, 2022, including details of the November 2 call. *Id*., ¶ 21, Tab 9.  It did not receive a response. *See Id*.

66.     Presbyterian emailed HRSA to follow up on the draft Phase 4 reconsideration request on November 8, 2022. *Id*., ¶ 22, Tab 10.  It did not receive a response. *See Id*.

67.     On November 9, 2022, Presbyterian submitted its Phase 4 reconsideration request to HRSA. *Id*., ¶ 23, Tab 11, p. 4.  The request reiterated the shared understanding of HRSA and

Presbyterian in November 2022 that the HRSA portal had lost part of the substantiating Excel file submitted with the Phase 4 application.  *See Id*.[2]

68.    Presbyterian heard nothing further from HRSA for approximately two months.  So Presbyterian emailed HRSA on January 13, 2023 to follow up.  *Id*., ¶ 24, Tab 12, pp. 2-3.  HRSA stated in response that it had "no insights to share" but added that "[t]he Reconsideration Team is a diligent group so I know they will [] have outcomes for reconsideration requests as soon as they are able."  *Id*., p. 1.

69.    Presbyterian again heard nothing further from HRSA for approximately two months.  So Presbyterian emailed HRSA on March 1, 2023 to follow up.  *Id*., ¶ 25, Tab 13, p. 2. Presbyterian received no response.  *See Id*.

70.    Presbyterian emailed HRSA on March 23, 2023 to follow up.  *Id*., pp. 1-2.  HRSA stated that it did "not yet have a specific timeframe for the Phase 4 reconsideration determinations," and that Presbyterian should "[f]eel free to continue to periodically check-in."  *Id*., p. 1.

71.    Presbyterian emailed HRSA on May 26, 2023 to check in.  *Id*., ¶ 26, Tab 14, p.1. HRSA responded that day that the process was ongoing, *and that Presbyterian should check in with HRSA again in June 2023*:

> The PRF Reconsideration Team continues to work on reconsiderations.  There has now been some determinations.  So far, you [sic] reconsideration request has not been on the list of completed determinations.  I'll continue to monitor as determinations are made and contact you if I hear of the outcome.  *Feel free to check in again next month.*

---

[2] Presbyterian understands that HRSA's position beginning in November 2023 is there was no technical problem with the HRSA portal and Presbyterian inadvertently uploaded an Excel file that omitted the substantiation for actual quarterly losses.  Unfortunately, the only record of the upload of the Phase 4 application that Presbyterian could obtain at the time of the upload is a PDF of the completed Phase 4 application.  That PDF does not list the name of the Excel file that Presbyterian uploaded to the HRSA portal. *See* Ex. 1, ¶ 13, Tab 13.  So, Presbyterian does not possess a contemporaneous record that addresses HRSA's current position.

*Id.* (emphasis added).

72.     HRSA then summarily denied Presbyterian's Phase 4 reconsideration request, and deprived Presbyterian of $10,562,495.52 in PRF dollars.

73.     On June 5, 2023, HRSA posted the following Program Update on its website:

> With the passage of the Fiscal Responsibility Act of 2023 and related rescission of program funds, *no further payments will be made to providers under the Provider Relief Fund or the American Rescue Plan Rural Distribution, including no reconsideration payments.*  Likewise, no additional claims payments will be made under the Uninsured Program or Coverage Assistance Fund.  Per the Terms and Conditions of each Program, all reporting and auditing requirements will continue without disruption.

74.     HRSA, <u>Program     Update:     June     2023</u>, Provider     Relief, <u>https://www.hrsa.gov/provider-relief</u> (last visited Dec. 26, 2023) (emphasis added).

75.     Approximately five months later, on October 31, 2023, HRSA sent a form email to Presbyterian.  The form email said that the FRA reserved some PRF dollars for HRSA, but restricted HRSA's use of those dollars to "program administration and oversight," which supposedly excludes the making of reconsideration payments:

> On June 3, 2023, the Fiscal Responsibility Act of 2023 was enacted.  This law rescinded unobligated funds appropriated for the Provider Relief Fund (PRF) … *with the exception of limited funds that Congress specifically directed be used for HRSA's program administration and oversight.*
>
> **After the enactment of the Fiscal Responsibility Act, no further payments will be made in any of the provider relief programs, meaning no reconsideration payments will be made and no claims reimbursed**.

Ex. 1, ¶ 27, Tab 15 (italics added).  HRSA also sent Presbyterian a form letter dated November 3, 2023, that contained the same statement.  *Id.*, ¶ 28, Tab 16.

76.     HRSA has resolved putative APA lawsuits with, and made reconsideration payments to, one or more providers since June 5, 2023.

**D.     HRSA violated the APA when it summarily denied Presbyterian's Phase 4 reconsideration request and changed its policy on reconsiderations**

77.     HRSA acted arbitrarily and capriciously by summarily denying Presbyterian's Phase 4 reconsideration request without first considering whether doing so was reasonable given: the statutory criteria for payment; HRSA's granting of reconsideration relief to a similarly situated provider; HRSA's conduct and representations; and Presbyterian's reliance on the same.

78.     HRSA acted arbitrarily and capriciously by summarily denying Presbyterian's Phase 4 reconsideration request when: Presbyterian indisputably met all the statutory criteria for the payment of PRF dollars; HRSA had granted reconsideration relief to a similarly situated provider; HRSA encouraged Presbyterian to invoke the reconsideration process based on HRSA's reasons for the lower payment on the Phase 4 application; HRSA uploaded substantiating documentation to the case record for the Phase 4 application before Presbyterian filed a reconsideration request; and Presbyterian relied on HRSA's conduct and representations in preparing and pursuing a reconsideration request.

79.     What is more, the FRA reserved billions of dollars from five appropriations for the Public Health and Social Services Emergency Fund (PHSSEF).  *See* Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, Div. B, Tit. I, § 2(1), 137 Stat. 10, 23 (2023) (rescinding "[a]ll of the unobligated balances of funds made available under the heading 'Public Health and Social Services Emergency Fund' in Title III of division A of Public Law 116-123, including any funds transferred from such heading that remain unobligated, with the exception of $59,000,000."); *see also id.*, § 2(3) (rescinding "[a]ll of the unobligated balances of funds made available under the heading 'Public Health and Social Services Emergency Fund' in Title VIII of division B of Public Law 116-136, including any funds transferred from such heading that remain unobligated, with the exception of $2,127,000,000" and certain other funds); § 2(4) (rescinding "[a]ll of the unobligated

21

balances of funds made available in the first paragraph under the heading 'Public Health and Social Services Emergency Fund' in title I of division B of Public Law 116-139, including any funds transferred from such heading that remain unobligated, with the exception of $300,000,000, which shall remain available for necessary expenses for program administration and oversight."); § 2(5) (rescinding "[a]ll of the unobligated balances of funds made available under the heading 'Public Health and Social Services Emergency Fund' in Title I of division B of Public Law 116-139, including any funds transferred from such heading that remain unobligated, with the exception of $234,000,000" and certain other funds); § 2(6) (rescinding "[a]ll of the unobligated balances of funds made available under the heading 'Public Health and Social Services Emergency Fund' in Title III of division M of Public Law 116-260, including any funds transferred from such heading that remain unobligated, with the exception of $205,000,000.").  The PHSSEF fed the PRF.

80.     When HRSA summarily denied Presbyterian's Phase 4 reconsideration request, HRSA acted arbitrarily and capriciously by failing to notify Presbyterian individually and explain *why* it chose to use available PRF dollars for purposes besides a reconsideration payment.

81.     The HRSA policy change ending all reconsideration payments was equally arbitrary and capricious.  HRSA failed to consider whether providers in the Phase 4 reconsideration process had reliance interests, determine whether those interests were significant, and weigh any such interests against competing policy concerns.

82.     HRSA was not writing on a blank slate.  It created the reconsideration process through guidance.  It told providers that it would adjudicate Phase 4 reconsideration requests based on the figures in the Phase 4 applications and would "request additional or clarifying documentation from an applicant directly, as needed."  The import of the guidance was that HRSA would correct calculation errors on the face of the Phase 4 application and, "as needed," request "additional or clarifying documentation" to substantiate the figures set out in the application.

HRSA had also encouraged Presbyterian—and, upon information and belief, other individual providers—to pursue the Phase 4 reconsideration process when HRSA believed they had good cases.  Providers such as Presbyterian relied on HRSA's representations and conduct and invested time and resources in preparing and pursuing Phase 4 reconsideration requests.

83.     The providers had significant reliance interests.  They could have pursued judicial relief, and instead prepared and pursued Phase 4 reconsideration requests.  In reconsiderations where the sole issue was the substantiation of the figures in the Phase 4 application, and HRSA accepted substantiating documentation from the provider, the provider had a reasonable expectation of success.  A successful outcome would enable the provider to offset medically necessary expenses incurred and revenues lost due to COVID-19 and free up available funding for ongoing operations.  It was significant for providers to defer pursuit of judicial relief and seek economic relief from HRSA based on HRSA representations and conduct.

84.     As stated previously, HRSA could have accounted for serious reliance interests in a variety of ways.  HRSA, for example, could have prioritized the adjudication of reconsideration requests that were based on HRSA's acceptance and uploading of documents that substantiated the figures in the underlying application.  Such a prioritization would have been expedient because HRSA knew when it accepted and uploaded documents for providers.  Plus, no disputed issues remained once the figures in the underlying applications were substantiated.  HRSA could have conducted such prioritization long before the FRA became law.

85.     Alternatively, after the FRA became law, HRSA could have conducted a phased, orderly, and transparent termination of the reconsideration process.  HRSA could have prioritized reconsideration requests based on reliance interests, explained the prioritization to providers, projected the PRF dollars that HRSA would make available for reconsideration requests, disclosed

how HRSA planned to use the remaining PRF dollars, adjudicated reconsideration requests in order of priority, and paid providers accordingly.

86.     HRSA failed to weigh such options against competing policy concerns.  Indeed, HRSA did not identify any other uses of PRF dollars in its Program Update.

87.     The Program Update is striking. When other agencies make significant policy changes, they release decision memorandums or publish Federal Register notices setting forth their legal grounds and policy rationales.  HRSA ended a multi-year, multi-billion-dollar pandemic relief program abruptly, through a three-sentence post on its website, without identifying and addressing any alternative uses of available PRF dollars.  The Program Update evidences a lack of reasoned decision making when HRSA made the policy change.

88.     In its subsequent form email and letter, HRSA tried to introduce a new, *post hoc* rationale for its summary denial of Presbyterian's Phase 4 reconsideration request and policy change.  But HRSA's rationale at the time of the final agency actions is the only one that matters.  HRSA cannot cure its arbitrary and capricious final agency actions by sending a *post hoc* rationale to Presbyterian approximately five months after the fact.

89.     What is more, HRSA's *post hoc* rationale is contrary to the text of the FRA and HRSA's own conduct since June 5, 2023.

90.     The FRA reserved billions of dollars from five separate appropriations to the PHSSEF (which fed the PRF).  The FRA limited only one of those reservations to "necessary expenses for program administration and oversight." "[P]rogram administration and oversight" plainly encompasses the adjudication of reconsideration requests and the making of reconsideration payments.  HRSA has the authority to use all reserved funds—including those limited to "necessary expenses for program administration and oversight''—to make a reconsideration payment to Presbyterian of $10,562,495.52.

91.     HRSA's *post hoc* rationale cannot be right because HRSA has made reconsideration payments to one or more providers since June 5, 2023, to settle threatened APA litigation challenging HRSA's denial of PRF dollars.  If Congress foreclosed HRSA from using reserved funds to make reconsideration payments, then HRSA could not have made any reconsideration payments after the FRA became law.

92.     HRSA's *post hoc* rationale also fails to address an important part of the problem: whether HRSA should use recouped PRF dollars to make reconsideration payments.  Recouped PRF dollars are unaffected by the FRA and remain available.

93.     To the extent HRSA now asserts that Presbyterian inadvertently uploaded an Excel file that omitted the substantiation for actual quarterly losses—and Presbyterian was therefore barred from amending its Phase 4 application through the reconsideration process—that is yet another *post hoc* rationale.  What is more, HRSA did not put Presbyterian on fair notice that HRSA would categorically deny Phase 4 applications based on inadvertent mistakes.  Nor did HRSA put Presbyterian on fair notice that HRSA would construe the agency's own uploading of substantiating documents for providers as impermissible amendments to Phase 4 applications.  In fact, HRSA stated just the opposite in guidance: HRSA would, as needed, request substantiating documents from providers when correcting payment calculations during the reconsideration process.  HRSA also encouraged Presbyterian to pursue reconsideration and uploaded a substantiating Excel file for Presbyterian.  HRSA plainly expected to consider that Excel file during any reconsideration.  So, even if HRSA held such a *post hoc* rationale when it denied Presbyterian's Phase 4 reconsideration request, the denial was arbitrary and capricious given the lack of fair notice, as well as HRSA's conduct and statements to the contrary.

## CLAIMS FOR RELIEF

### Count I
### Administrative Procedure Act
### Summary Denial of Phase 4 Reconsideration Request

94.     Presbyterian incorporates allegations 1 through 93 into Count I.

95.     "[F]inal agency action for which there is no other adequate remedy in a court" is subject to judicial review.  5 U.S.C. § 704.

96.     "The reviewing court shall— … (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

97.     A final agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.   An agency must act within a zone of reasonableness and, in particular, reasonably consider the relevant issues and reasonably explain the decision.

98.     The Program Update is evidence that HRSA summarily denied Presbyterian's Phase 4 reconsideration request.  The summary denial was a final agency action.

99.     The summary denial of the Phase 4 reconsideration request was arbitrary and capricious for all the reasons alleged by Presbyterian above.

100.    The Court must hold unlawful and set aside the summary denial of the Phase 4 reconsideration request because it was arbitrary and capricious.

**Count II**
**Administrative Procedure Act**
**Policy Change Ending All Reconsideration Payments**

101.    Presbyterian incorporates allegations 1 through 100 into Count II.

102.    HRSA may change its policy on reconsideration requests, but only if HRSA acknowledges the change publicly, provides good grounds for the change, and accounts for reliance interests.  To account for reliance interests, HRSA must consider whether providers have reliance interests, determine whether those interests are significant, and weigh any significant reliance interests against competing policy concerns.

103.    The Program Update is evidence that HRSA changed its policy on reconsideration to end all reconsideration payments.  The policy change was a final agency action.

104.    The policy change is arbitrary and capricious for all the reasons alleged by Presbyterian above.

105.    The Court must hold unlawful and set aside the policy change because it is arbitrary and capricious.

**PRAYER FOR RELIEF**

For the foregoing reasons, Presbyterian respectfully requests that this Court:

1.    Declare unlawful and set aside the summary denial of Presbyterian's Phase 4 reconsideration request because it is arbitrary and capricious;

2.    Declare unlawful and set aside the policy change ending all payments of PRF dollars because it is arbitrary and capricious;

3.    Order the Defendants to obligate presently unobligated PRF dollars or set aside recouped PRF dollars in the total amount of $10,562,495.52 for payment to Presbyterian, subject to the adjudication of Presbyterian's Phase 4 reconsideration request with the documentation substantiating actual quarterly losses;

27

4.      Order the Defendants to adjudicate the Phase 4 reconsideration request with the documentation substantiating actual quarterly losses;

5.      Order the Defendants, as part of adjudicating the Phase 4 reconsideration request, to determine the total PRF dollars payable to Presbyterian for Phase 4, and the amount of those PRF dollars that remain unpaid;

6.      Order the Defendants to complete the adjudication and remit the unpaid PRF dollars to Presbyterian within a reasonable time;

7.      Award Presbyterian its costs and reasonable attorney's fees; and

8.      Grant such other and further relief as the Court deems just and proper.

Dated: January 10, 2024                    Respectfully submitted,

ARNALL GOLDEN GREGORY LLP


_____
Brian R. Stimson
D.C. Bar No. 1657563
2100 Pennsylvania Ave., NW Suite 350S
Washington, DC 20037
(202) 677-4948
Brian.Stimson@agg.com

*Pro Hac Vice Forthcoming*


MADISON, MROZ, STEINMAN, KENNY &
OLEXY, P.A.


*/s/ Rebecca S. Kenny*\_\_\_\_
Rebecca S. Kenny
P.O. Box 25467
Albuquerque, NM 87125
(505) 242-2177
rsk@madisonlaw.com

*Attorneys for Plaintiff*